UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAXTAK CAPITAL ADVISORS LLC, MAXTAK PARTNERS LP and DAVID GREENBAUM,<br><br>           Plaintiffs,<br><br>- against -<br><br>PARKERVISION, INC., JEFFREY L. PARKER and ROBERT G. STERNE,<br><br>           Defendants. | INDEX NO._____<br><br>**COMPLAINT** |

Plaintiffs MaxTak Capital Advisors LLC, MaxTak Partners LP and David Greenbaum (collectively, "Plaintiffs"), by their undersigned counsel, allege the following based upon personal knowledge as to matters concerning Plaintiffs and their own acts and upon information and belief as to all other matters.

## INTRODUCTION

1.      This action concerns a fraud committed by ParkerVision, Inc. ("ParkerVision" or the "Company"), Jeffrey Parker, the Company's Chairman and Chief Executive Officer ("Parker), and Robert G. Sterne, a director of ParkerVision and partner of Sterne, Kessler, Goldstein & Fox PLLC, the Company's patent counsel ("Sterne"), during the period from March 2007 through December 2008 (the "Relevant Time Period").  In that time frame, Plaintiffs purchased tens of millions of dollars' worth of ParkerVision stock at prices inflated by the fraudulent conduct of ParkerVision, Parker and Sterne (collectively, "Defendants").   During the Relevant Time Period, MaxTak Capital Advisors LLC and MaxTak Partners LP (the "MaxTak

Plaintiffs") also sold numerous put options (thereby demonstrating their belief that ParkerVision stock would increase in price) at prices artificially deflated by Defendants' fraud.

2.      ParkerVision is a public company that describes itself as a designer, developer and vendor of proprietary radio frequency ("RF") power amplification ("PA") technologies and products for use in semiconductor circuits for wireless communication products.

3.      As Plaintiffs detail below, Defendants committed and accomplished their fraudulent scheme by (a) making false statements that convinced Plaintiffs and other ParkerVision investors that the Company's primary product, the "d2p" transmitter-power amplifier, produced significant power savings benefits when employed in telephones and other wireless devises, (b) misrepresenting and concealing the actual nature of the business relationships that existed between ParkerVision and its supposed key customers, the original equipment manufacturers ("OEMs") of handsets and other wireless devices, by creating the illusion and expectation that these potential customers had favorably received ParkerVision's technology and would enter into contracts with the Company to license that technology, (c) misrepresenting the Company's financial results, and (d) misrepresenting the Company's prospects for developing profitable sales of its d2p technology.  Each aspect of the fraud was carefully orchestrated and coordinated by the Defendants to create the false illusion that the Company possessed viable, tested, cutting-edge technology that was ready for market and that significant OEMs were actively pursuing.

4.      Actual power savings would have translated into significantly improved battery life for cell phones and other wireless devices and, therefore, a large market for ParkerVision's transmitter-power amplifier technology among the original equipment manufacturers ("OEMs") of those products.  Indeed, Defendants repeatedly represented that, because of the supposedly

2

superior performance of ParkerVision's d2p technology, the Company would soon secure highly lucrative agreements to incorporate that technology into mass-produced OEM products.

5.      Defendants' representations were false because, as Defendants well knew, the d2p technology simply did not work.

6.      Thus, Defendants had knowledge that the products that they repeatedly heralded to investors had no commercial value.  As a result, no possibility ever existed that ParkerVision would consummate the lucrative OEM deals that Defendants highlighted, and the ParkerVision stock that Plaintiffs purchased and the put options that they sold were essentially worthless.

7.      Nevertheless, in a vain attempt to keep ParkerVision afloat until the Company could somehow produce a viable product, Defendants never admitted the falsity of their representations concerning the d2p technology and their efforts to derive commercial sales or licensing revenue related to that technology.  Instead, Defendants made numerous public statements omitting material facts and deliberately misrepresenting: (a) d2p's effectiveness and value; (b) the interest expressed by OEMs and other manufacturers in developing and commercializing products integrating d2p technology; (c) ParkerVision's financial results; and (d) the Company's prospects for developing profitable sales of its d2p technology.

8.      By maintaining the illusion that d2p technology demonstrated substantial commercial promise, Defendants succeeded in completing a series of private offerings of ParkerVision securities that allowed the Company to survive despite its steady annual losses and to conduct limited research and development efforts that Defendants hoped would produce a viable product.

9.      As was inevitable, however, Defendants' fraudulent scheme failed and investors were left holding ParkerVision securities that were all but worthless.  By the time that Plaintiffs

liquidated their holdings of ParkerVision stock, that stock had declined dramatically in value from the levels at which Plaintiffs purchased those securities.

10.     Thus, Plaintiffs' sales of ParkerVision stock and puts produced massive losses – even as Defendants continued to assure investors that d2p represented a breakthrough technology and that ParkerVision would soon produce commercial success.

11.     In fact, since ParkerVision announced its d2p technology in January 2005, the Company has managed to produce just $412,000 in revenue.  That inability to generate any meaningful sales or licensing income in an industry where OEMs are constantly adopting new technologies to improve battery life serves as compelling proof that the d2p technology did not perform as Defendants represented and, therefore, of Defendants' fraud.

12.     Accordingly, Plaintiffs seek compensatory and punitive damages to compensate them for their losses and to punish Defendants for their egregious misconduct.

## PARTIES

13.     Plaintiff MaxTak Capital Advisors LLC ("MaxTak Capital") is a limited liability company organized under the laws of the State of Delaware that maintains its principal place of business in the State of New Jersey.  None of the members of MaxTak Capital are residents of the states of Florida or Virginia.

14.     Plaintiff MaxTak Partners LP ("MaxTak Partners") is a limited partnership organized under the laws of the State of Delaware with its principal place of business located in New Jersey.  None of the partners of MaxTak Partners are residents of the states of Florida or Virginia.

15.     As a result of Defendants' fraud, the MaxTak Plaintiffs purchased tens of millions of dollars in ParkerVision common stock at inflated prices during the Relevant Time Period and

4

lost the vast majority of the money that they invested in those securities.  Likewise, the MaxTak Plaintiffs' substantial sales of ParkerVision puts proved wildly unprofitable because of Defendants' fraud.  The MaxTak Plaintiffs have attached hereto as Exhibit A spreadsheets that specifically identify the dates of their purchases of ParkerVision stock, the number of shares that the MaxTak Plaintiffs purchased collectively on those dates and the prices paid for those securities.

16.     Plaintiff David Greenbaum is a New Jersey resident.  As a result of Defendants' fraud, Greenbaum purchased hundreds of thousands of dollars in ParkerVision common stock at inflated prices during the Relevant Time Period and lost the overwhelming majority of that investment.  In particular, in reliance upon Defendants' fraudulent misrepresentations and omissions, Greenbaum purchased ParkerVision stock: between May 10, 2007 and June 22, 2007 at prices between $10.99 and $11.65 per share; between December 10, 2007 and December 31, 2007 at prices between $9.41 and $15.36 per share; between January 17, 2008 and October 2, 2008 at prices between $7.53 and $12.10 per share; and between November 4, 2008 and December 3, 2008 at prices between $2.67 and $5.77 per share.

17.     Defendant ParkerVision is a Florida corporation with its principal place of business located at 7915 Baymeadows Way, Suite 400, Jacksonville, Florida 32256.

18.     Defendant Jeffrey Parker is and was at all relevant times ParkerVision's Chairman and Chief Executive Officer.  Parker also served as ParkerVision's President from April 1993 to June 1998.  Parker is a Florida resident.

19.     Defendant Robert G. Sterne is and was at all relevant times a director of ParkerVision and partner of Sterne, Kessler, Goldstein & Fox PLLC, the Company's patent

5

counsel.  In addition to his duties as a director, Sterne provides legal services to the Company as its principal patent and intellectual property attorneys.  Sterne is a Virginia resident.

## JURISDICTION AND VENUE

20.     This court has jurisdiction over this action by virtue of 28 U.S.C. § 1332.  The parties are citizens of different states and the amount in controversy greatly exceeds $75,000.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this District, where Plaintiffs resided at the time they: (a) read and heard Defendants' misrepresentations and omissions; (b) made their purchases of ParkerVision stock; and (c) suffered the losses for which they seek relief.

22.     Defendants engaged in continuous and systematic business activity in this District.  Throughout the Relevant Time Period, Plaintiffs regularly listened from New Jersey to conference calls during which Defendants made certain of the misrepresentations and omissions alleged below.  Defendants also regularly communicated with Plaintiffs concerning ParkerVision's products and business prospects by means of telephone calls, press releases, SEC filings and other public representations that Defendants intentionally provided to Plaintiffs in New Jersey.

## SUBSTANTIVE ALLEGATIONS

## I.    PARKERVISION'S PURPORTED BUSINESS PLAN

23.     ParkerVision's filings with the Securities and Exchange Commission ("SEC") state that the Company designs, develops and sells proprietary RF technologies and products for use in semiconductor circuits for wireless communication products.

24.     Throughout the Relevant Time Period, Defendants portrayed ParkerVision as a technological innovator engaged in the development of cutting edge RF products designed to improve significantly the battery life of cellular phones, smartphones and other wireless products.  Defendants consistently represented that companies that commanded a significant market share in the wireless communications markets were contemplating licensing agreements or development partnerships that would allow ParkerVision to generate significant revenue from the licensing of its technology.

25.     As represented to the public, ParkerVision's promise related to the Company's direct-to-power, or "d2p," technology.

26.     Defendants repeatedly informed investors that d2p technology represents a breakthrough in RF PA's that purportedly combines the functions of a traditional transmitter and a PA into a single unified system.  Defendants apprised investors that this technological breakthrough produces improved performance and higher efficiency.

27.     A typical wireless radio signal begins as a low frequency baseband signal that is then modulated onto a RF carrier signal via a transmitter.  The modulation, *i.e.*, the variations in the signal's amplitude and timing, contains the data being transmitted.  In the process of creating the RF carrier, the transmitter oftentimes generates unwanted RF signals that need to be filtered out.  The RF carrier signal is then run through a power amplifier in order to generate a signal strong enough for transmission to distant receivers, a process that typically consumes large amounts of power.  As with the transmitter, the power amplifier commonly generates RF signal distortions that can cause bad reception at the receiving end of the signal.  These distortions must be filtered out in order to correctly demodulate the received signal and process it into usable

data.  The use of power amplifiers typically involves a trade-off between power efficiency and signal distortion.

28.     A product that efficiently transmits and boosts RF signals without generating significant signal distortion would have tremendous value to mobile phone manufacturers, wireless internet providers, and other companies utilizing RF communications systems.

29.     Defendants claimed that ParkerVision's unique d2p digital amplifier architecture addressed the traditional trade-offs between power efficiency and signal distortion in a "revolutionary" way.  According to Defendants, d2p technology was capable of combining the functions of a RF transmitter and power amplifier with much greater power efficiency and less signal distortion than typical devices.  Defendants claimed that the d2p technology converted analog or digital data streams directly into RF carriers at the required signal strength in an efficient, unified operation.

30.     ParkerVision also claimed that its d2p power amplifiers reduced transmitter power consumption for many battery-operated wireless products by 50% to 80%.  Furthermore, d2p power amplifiers were purportedly produced as single-chip integrated circuits ("IC's") rather than the multi-component modules typically employed by traditional power amplifiers, yielding significant size advantages.  Defendants also claimed that d2p power amplifiers were produced using common silicon rather than the more expensive materials typically used in RF power amplifiers, resulting in significantly lower costs.  As single-chip IC's, d2p power amplifiers were purportedly easier to integrate into devices utilizing RF wireless communications, though ParkerVision's licensing efforts focused mainly on the mobile telephone market.

31.     Defendants also informed investors that traditional wireless transmitters are particularly inefficient at processing wireless data that appears in multiple waveforms.  For

example, a system tuned to process both CDMA (Code-Division Multiple Access) and GSM (Global System for Mobile Communications) waveforms—both commonly utilized in mobile telephones—will do so less efficiently than a system tuned to process just one of those waveforms.  As a result, multi-mode wireless devices, which access multiple wireless networks/waveforms, typically use multiple transmitters and PAs, with each waveform receiving its own transmit chain.  However, while these systems minimize signal distortion, they are extremely power inefficient.  During the Relevant Time Period, ParkerVision asserted that its d2p technology was capable of handling multiple waveforms with minimal signal distortion and much greater power efficiency than traditional transmitters/power amplifiers.

32.    Had Defendants' description of the capabilities of ParkerVision's d2p technology been true, ParkerVision securities would have been a sound investment for Plaintiffs because OEMs would have eagerly utilized low-cost, multi-mode transmitter-amplifiers that combined impressive power efficiency with minimal signal distortion.  As detailed below, however, Defendants' statements regarding the capabilities of ParkerVision's d2p technology were grossly inaccurate and fraudulently designed to mislead investors and the market for ParkerVision securities.

## II.    THE MANNER IN WHICH DEFENDANTS' REPRESENTATIONS AND OMISSIONS WERE MATERIALLY MISLEADING

33.    During the Relevant Time Period, Defendants made numerous public statements omitting material facts and deliberately misrepresenting: (a) d2p's effectiveness and value; (b) the interest expressed by OEMs and other manufacturers in developing and commercializing products integrating d2p technology; (c) ParkerVision's financial results; and (d) the Company's prospects for developing profitable sales of its d2p technology.

34.     The principal reason why Defendants' statements were materially false and misleading is quite simple in some respects: ParkerVision's d2p technology simply did not provide the supposed power efficiency benefits for wireless devices that Defendants described in their public statements and their actual development and commercialization efforts bore no resemblance to the efforts that Defendants described.

35.     Indeed, ParkerVision's d2p technology was actually inferior to the RF power amplification solutions that OEMs of cell phones and other mobile devices had already incorporated into their existing products, not to mention new technologies that those companies planned to utilize in devices under development.

36.     Defendants succeeded in hiding the deficiencies of their technology from investors because the reasons why ParkerVision's technology lacked any significance as a commercial product were technical in nature, and Plaintiffs and other ParkerVision shareholders did not possess the engineering knowledge or the resources required to assess the d2p technology independently.

37.     Thus, by maintaining their consistent mantra in public statement after public statement that the d2p technology represented a breakthrough technology that was enticing important OEMs to explore licensing arrangements with ParkerVision, Defendants succeeded in drowning out any dissenting voices concerning the significance and viability of the technology.

38.     The dissenting voices concerning ParkerVision's d2p technology were correct, however.

39.     In particular, the work of two distinguished electrical engineers – Drs. Barb Paldus and Mike Farmwald – explains in detail the technical reasons why Defendants'

consistently positive representations concerning the d2p technology were materially false and misleading.

40.     Drs. Paldus and Farmwald are Stanford Ph.D.'s who launched a web site named "PV Notes" in 2007 to point out the falsity of Defendants' representations concerning ParkerVision's d2p technology.

41.     Dr. Farmwald is a well-known Silicon Valley inventor, entrepreneur and venture investor who has founded numerous technology companies, including Rambus and Matrix Semiconductor.

42.     Dr. Paldus is also an accomplished business executive and electrical engineer. She has secured 21 patents, currently has numerous pending patent applications, and has published over 30 journal and conference papers.  She has also been recognized with numerous research and academic awards.

43.     On the PV Notes website, Drs. Farmwald and Paldus, and other highly qualified scientists, have analyzed the d2p chip extensively and concluded that ParkerVision's technology does not provide the energy-saving benefits that Defendants have touted.

44.     The experts that Drs. Paldus and Farmwald enlisted to review the d2p technology include several Silicon Valley entrepreneurs with extensive technical and business backgrounds. In combination, those experts hold six Ph.D. degrees in Electrical Engineering, possess over 100 years of engineering experience in the technology field (including the wireless industry), and hold more than 200 patents.

45.     As PV Notes explains, ParkerVision patented its d2p chip in 2005 (Patent No. 7,218,899).  Because the d2p chip did not achieve the power amplification efficiency that Defendants publicly touted, ParkerVision redesigned the d2p chip several times in an effort to

achieve the enhanced performance that Defendants described.  Following several of those redesigns, ParkerVision submitted new patent applications related to the redesigned chips.

46.    In fact, however, the redesigned d2p technology provided no greater power amplification efficiency than ParkerVision's original designs.

47.    Rather, PV Notes explains that ParkerVision has promoted as revolutionary "what in mainstream PA [*i.e.,* power amplification] circles has been termed the 'bonehead' approach, where a simple power combiner, or parallel output connection, of two amplifying devices is used to sum the two output currents."

48.    PV Notes further explains that while the "simplistic approach" embodied in ParkerVision's d2p technology could decrease the battery consumption of the power amplifier, that approach inevitably produces other inefficiencies that prevent the technology from achieving commercial viability.

49.    As PV Notes explains:

> [I]t is possible that [ParkerVision] can build a PA system which is based on their core concepts, which will have ***comparable, but not better, efficiency*** than that being routinely obtained and deployed using existing industry-standard PA technology.  We believe, however, that the ***linearity will be significantly worse at comparable efficiency levels***.  (Emphasis in original).

50.     In other words, ParkerVision's d2p technology did not, as Defendants claimed, deliver better power efficiency for cell phones and other wireless devices.  Rather, the ParkerVision power amplifier system would, at best, produce power efficiency levels comparable to those achieved by existing products.

51.    Equally as important, the use of ParkerVision's d2p technology in a wireless device would negatively impact the RF performance of the device, and thereby prevent the device from attaining commercial viability.

52.     A technical paper by Dr. Steve Cripps published on the PV Notes website further demonstrates the falsity of Defendants' representations concerning the supposed benefits of ParkerVision's d2p technology.

53.     Dr. Cripps holds masters and Ph.D. degrees from Cambridge University, England. By the time of his critique of ParkerVision's technology, Dr. Cripps had worked in the RF power amplifier field for 25 years.  He was the author of 3 books on the subject of power amplifiers: *RF Power Amplifiers for Wireless Communications, Second Edition* (2006); *Advanced Techniques in RF Power Amplifier Design* (2002); and *RF Power Amplifiers for Wireless Communications* (1999).  Dr. Cripps is also the author of several papers regarding RF power amplification and a regular contributor to technical workshops in that field.

54.     His 2007 critique of ParkerVision's technology stated, "I have consulted for at least 15 companies on power amplifiers, including many leaders in the field of PA design.  I am the current chair-elect of the Power Amplifier subcommittee of the Institute of Electrical and Electronic Engineers, Microwave Theory and Techniques Society (IEEE-MTT), and regularly participate in the review of papers submitted to the International Microwave Symposium and the Transactions of MTT."

55.     In his analyses, Dr. Cripps pointed out the fatal defects in ParkerVision's d2p technology described in the company's original patent (Patent No. 7,184,723).  In particular, he concluded that ParkerVision's d2p technology could not achieve in a commercial setting the efficiencies and resulting extended battery life that Defendants repeatedly touted.

56.     Dr. Cripps also analyzed ParkerVision's subsequent patent (No. 7,218,899), which ParkerVision apparently filed to address the undisclosed problems with the Company's original design of the d2p technology.

57.     Dr. Cripps's paper explained that RF PA engineers widely recognize that the technique that ParkerVision employed for transmitting and amplifying RF signals will not produce greater efficiency than conventional amplification methods.  In addition, Dr. Cripps explained that ParkerVision's claimed higher peak efficiency for its PA was "almost an irrelevant performance parameter" because "a modern communications signal reaches its peak value very infrequently."

58.     Defendants based their contrary contentions regarding the efficiency of the d2p technology upon misleading data that ignored the impact that ParkerVision's technology had upon the quality of the RF signal produced by wireless devices.

59.     Specifically, Dr. Cripps explained that engineers recognize that it is possible to produce a PA with much higher efficiency than the PAs that manufacturers currently employ in their devices, *i.e.*, PAs that cause significantly less drain on mobile wireless units' batteries.

60.     Engineers also recognize, however, that achieving the improved efficiency produces the unwanted byproduct of distorting devices' RF signal.  Engineers currently can overcome that problem only by utilizing a device called a Digital Signal Processer ("DSP") to remove that distortion (digital pre-distortion or DPD).

61.     All known techniques for combating DPD consume more power than is saved by utilizing a PA with greater efficiency than the units that manufacturers currently employ in their products.  Thus, Dr. Cripps concluded that, when assessing the efficiency of a PA, "it is essential that the power supplied to the DPD is included in the efficiency calculation."

62.     Defendants' statements concerning the supposed efficiency benefits provided by ParkerVision's d2p technology have consistently ignored that necessary step.  Specifically, Defendants have touted the supposed efficiency improvements produced by d2p technology

14

*without* taking into account: (a) the increased power needed to correct the DPD; or (b) that the correction must be made to render commercially acceptable the RF signal produced with ParkerVision's d2p technology.

63.     In light of these facts, Dr. Cripps concluded that his analysis of ParkerVision's technology (which necessarily did not include an assessment of any hardware that actually incorporated d2p technology) demonstrated that, contrary to Defendants' representations, ParkerVision did not offer any "'disruptive' revolutionary approach to the implementation of power amplifiers in RF communications systems."

64.     In addition to offering technical critiques of ParkerVision's d2p technology, Dr. Farmwald capitalized upon his extensive contacts in the technology community to gather intelligence regarding leading companies' adverse views regarding ParkerVision and its technology.

65.     A December 3, 2007 article published in *Barron's* stated, "[Dr. Farmwald] had the world's leading experts on radio power amps examine ParkerVision's patents.  He's talked to the decision makers at companies where ParkerVision has pitched its technology.  No one has seen credible evidence that it works."

66.     The *Barron's* article further emphasized that Dr. Farmwald "gathered evidence from those who've evaluated ParkerVision's technology at RF Micro Devices, Skyworks, Anadigics, STMicroelectronics (STM), Freescale and Samsung."  According to Dr. Farmwald, all of the people who analyzed ParkerVision's technology "come away thinking it just doesn't work.  It's just gibberish."

67.      Dr. Farmwald also reported those findings on the PV Notes website. Specifically, in a July 6, 2008 post, Dr. Farmwald stated:

To date, *every single cellular chip vendor with whom we have spoken, has told us they have no interest in d2p or D2D*. Although they are prevented from saying anything publically about d2p (owing to the [ParkerVision non-disclosure agreement]), we are confident that none of these companies are going to license ParkerVision technology.  In fact, contrary to Jeff [Parker's] repeated statements, *a number of them have told Jeff that they don't believe the d2p technology works, and that they have no interest in continuing the discussion*.  (Emphasis added).

68.     Defendants vigorously disputed the findings of Dr. Farmwald and others skeptical of ParkerVision's technology, unequivocally asserting that such criticisms were unfounded and that d2p performed exactly as promised.  Thus, by maintaining their consistent mantra in public statement after public statement that the d2p technology represented a breakthrough technology that was enticing important OEMs to explore licensing arrangements with ParkerVision, Defendants succeeded in drowning out any dissenting voices concerning the significance and viability of the technology, including the PV Notes website.

69.     As Plaintiffs detail below, Defendants also made several representations during the Relevant Time Period concerning the royalty revenue that ParkerVision would generate through the use of its d2p technology in mobile devices.  Defendants based those statements upon the assumption that ParkerVision would generate royalties of between $0.50 and $1.00 per phone.

70.     As Dr. Farmwald pointed out in PV Notes, however, cell phone PA's generally cost less than $0.60 and rarely cost more than $1.00.  Moreover, the entire transmit chain of wireless devices typically costs well under $2.00.  Thus, as Dr. Farmwald noted, "royalties of $1.00 are far more than the profit of the entire transmit chain."  As a result, Dr. Farmwald noted that every cellular chip vendor that he queried "thinks that such royalties would never happen, and laugh at the foolishness of such claims – even if ParkerVision had working d2p technology."

16

71.     The falsity of Defendants' representations is also demonstrated by their abject

failure to produce any of the revenues that they have repeatedly primed investors to expect.

Despite years of representations that ParkerVision was on the verge of securing major customers

for its d2p technology, the Company generated a mere $412,000 in revenue between 2006 and

2010, and has not successfully secured a single OEM customer for its technology.

III.   **PLAINTIFFS' PURCHASES OF PARKERVISION SECURITIES IN RELIANCE UPON DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS**

72.      Plaintiffs relied directly on Defendants' material misrepresentations and

omissions at the time Plaintiffs made their purchases of ParkerVision stock and when the

MaxTak Plaintiffs sold ParkerVision puts.

73.     Before Plaintiffs began their purchases of ParkerVision common stock, they

engaged in significant due diligence regarding the Company and its management, including

reviewing the Company's past press releases and SEC filings.

74.     After the Plaintiffs began their purchases of ParkerVision common stock and the

MaxTak Plaintiffs began to sell ParkerVision puts, Plaintiffs continued to follow closely the

publicly available information concerning the Company and its technology.

75.     In particular, throughout the Relevant Time Period, all of the Plaintiffs reviewed:

(a) every press release issued by Defendants concerning ParkerVision's financial results and

important business developments, including all of the press releases in which Defendants made

the misrepresentations and omissions that Plaintiffs allege in paragraphs 83, 118-19, 122, 129-

30, 152 and 166; and (b) every quarterly and annual SEC filing made by ParkerVision, including

the SEC filings in which ParkerVision made the specific material misrepresentations and

omissions that Plaintiffs allege in paragraphs 87, 125 and 141.  Plaintiffs read those documents shortly after their publication, and frequently on the day that Defendants issued them.

76.      In deciding to purchase ParkerVision stock and to sell ParkerVision puts, the Plaintiffs relied directly upon those ParkerVision press releases and SEC filings.

77.      In addition, each Plaintiff read or listened to statements made by Defendants during various conference presentations, identified in paragraphs 112 and 138, shortly after these presentations took place.  In deciding to purchase ParkerVision stock and sell ParkerVision puts, Plaintiffs also relied upon the truthfulness and completeness of the statements made by Defendants during those presentations.

78.      Throughout the period in which they were purchasing ParkerVision securities, Plaintiffs also maintained a practice of listening to every investor conference call held by Defendants, including ParkerVision's normal quarterly conference calls and the investor calls that Defendants occasionally scheduled to announce "major developments."  Plaintiffs either listened to those conference calls live or shortly after the calls concluded by accessing the recordings of the calls that ParkerVision maintained on the Company's web site.

79.      At the time that they purchased ParkerVision stock and sold ParkerVision puts, Plaintiffs directly relied upon the false statements that Defendants made during those conference calls that Plaintiffs identify in paragraphs 84, 89, 92, 97-98, 100-01, 105-07, 109-10, 117, 121, 127, 131, 133, 135, 143-45, 147, 149, 154-55, 157, 160-61, 163, 168-69 and 171 of this Complaint.

80.      In addition, at the time that they made their purchases of ParkerVision stock and sales of ParkerVision puts, Plaintiffs reasonably believed – as a result of Defendants' misrepresentations – that Defendants had not failed to disclose the following material adverse

facts: (a) ParkerVision's d2p technology did not work in any way or produce actual power savings for wireless devices when utilized in a commercially viable configuration; (b) all of the target OEMs and other manufacturers that Defendants sought to induce to utilize or license d2p technology concluded that the technology had no commercial utility; (c) no OEM had ever expressed serious interest in utilizing ParkerVision's d2p technology in a commercial product; and (d) ParkerVision had no actual prospects for generating commercial sales of its products.

81.     Defendants were obligated to disclose those adverse facts during the Relevant Time Period because: (a) they made the contrary, positive representations that Plaintiffs specifically allege below; (b) Defendants conducted multiple offerings of ParkerVision securities during the Relevant Time Period; and (c) Defendants possessed special expertise regarding the characteristics of the d2p technology and had exclusive access to the material information concerning ParkerVision's efforts to induce manufacturers to purchase the d2p technology.

## IV.   DEFENDANTS' MATERIALLY MISLEADING REPRESENTATIONS AND OMISSIONS

### A.  The Third Quarter 2006 Results

82.     The material misrepresentations and omissions relevant to this action commenced on November 2, 2006, when Defendants reported the Company's third quarter results for 2006.

83.     In the November 2, 2006 press release announcing those results, Parker stated, "We are extremely pleased with the progress of our OEM discussions in recent months and remain confident that our efforts will result in consummation of our first relationships in the near term.  The feedback we are receiving from our potential business partners indicates that our d2p technology enables performance goals that the mobile handset industry is actively striving to achieve."

19

84.     That same day, ParkerVision held its 2006 third quarter earnings call.  During the call, Defendants provided further materially misleading information regarding ParkerVision's supposed progress in securing customers for its d2p technology.  Parker stated:

> In our opinion, *the announcement of our first deal is simply a when, not an if, question*.  We are extremely confident because the more time we spend in this industry talking with the executives of companies that are clearly the market leaders, the more we come to understand how our technology provides them with a compelling solution to problems they are facing today, and even more importantly, problems they see looming in the not too distant future.  (Emphasis added).

85.     For the reasons specified in paragraphs 34-67, the representations that Defendants made on November 2, 2006 were materially false and misleading at the time Defendants made them.

**B.   The Fourth Quarter and Year-End 2006 Results**

86.     In connection with the announcement of ParkerVision's fourth quarter and year-end 2006 financial results, Defendants made numerous materially false and misleading representations concerning the Company's d2p technology.

87.     In its Annual Report for 2006, filed on or about March 7, 2007, the Company stated:

> Our immediate market focus is on securing licensing agreements for our Direct2Power™ or d2p™ RF transmit chain technology.  Our target customers are top tier mobile handset manufacturers and their key semiconductor suppliers.  We believe our proprietary wireless technologies embody significant industry advances that can be commercialized in the near term...Our unique technology processes the RF waveform in a more optimal manner than existing technologies, thereby allowing OEMs to create handsets that have extended battery life, more easily incorporate multiple air interface standards and frequencies in smaller form factors, and reduce manufacturing costs.

88.     Those representations were materially false and misleading for the reasons specified in paragraphs 34-67.

89.     ParkerVision held its 2006 fourth quarter and year-end earnings call on March 8, 2007.  During the call, Parker provided the following materially misleading update regarding ParkerVision's supposed progress in finding customers for its d2p technology:

> We continue to have a flurry of activity ongoing with numerous target customers and although I can't go into the specifics of those activities, I can say that we remain highly confident that our first design wins will become a reality in the near-term.

90.     Those representations were materially false and misleading for the reasons specified in paragraphs 64-67.

**C.   The May 2, 2007 ITT Corporation Press Release and Conference Call**

91.     On May 2, 2007, Defendants announced that ParkerVision had entered a royalty-bearing intellectual property license agreement and Engineering Design Services agreement with ITT Corporation ("ITT"), a supplier of systems and products for government applications.

92.     During the conference call held to discuss that agreement, Parker made the following materially misleading representations:

> We are very excited to secure our first design win and to welcome ITT as the first licensee of our d2p technology.  ITT approached us with an interest in our d2p technology for use in government applications.  The RF design issues that ITT wanted to solve are not so different from those that we are encountering with OEMs in the mobile handsets space.  Namely, there's the universal need for improved battery life due to the growing complexity of the wave form used in RF communications, and there's an equally pressing need to collapse the multiple RF systems required in today's devices to support the large number of simultaneous standards.  And for ITT, those objectives must be met while achieving the rigorous specifications for government applications.
>
> Our d2p technology addresses all of these key needs.  ITT's in-depth technical evaluation resulted in the deep understanding of

the d2p technology.  Right down to the individual circuits.  In fact, right down to the transistor level of our demonstration chips.  They conducted laboratory bench analysis, which included measurements from working silicon.  And the deeper their understanding, the more enthusiastic they became to develop products using d2p technology.

Many of the specific terms of the ITT agreement are and will remain confidential.  However, we wanted to provide our investors with enough information to understand the financial implication of this arrangement in general...As we stated in our 8-K, we anticipate that the revenues from these agreements will offset a portion of our operating costs on an ongoing annual basis.  Furthermore, we anticipate that the cumulative royalties under this agreement will be approximately $25 million.

93.     Those representations were materially false and misleading for the reasons set forth in paragraphs 34-70.

94.     Moreover, contrary to Defendants' representations, ITT had not developed an "in-depth" understanding of ParkerVision's d2p technology by the time of the Company's announcement of the ITT agreement.  Nor had ITT identified any benefits provided by the d2p technology that ITT could incorporate into its own products.  As a result, no basis existed for Defendants' statement that the ITT agreement would produce "cumulative royalties" of "approximately $25 million."

95.     Indeed, soon after ParkerVision's announcement of the ITT agreement, ITT determined that the Company's d2p technology did not produce any improvements over existing RF technology and that ITT would not incorporate that d2p technology into any ITT products.  The ITT-ParkerVision relationship never led to the successful commercialization of d2p technology and ultimately produced a meager $154,000 in revenue for the Company.

### D.  **The Second Quarter 2007 Earnings Call**

96.    On August 8, 2007, Defendants announced ParkerVision's second quarter 2007

financial results, including revenue of $90,000 for the quarter.

97.    During the conference call that Defendants conducted to discuss the second

quarter results, ParkerVision Chief Financial Officer Cynthia Poehlman ("Poehlman") stated:

> Our revenue this quarter was from engineering design services.  As
> you know, we announced the first licensee of our d2p technology
> in May with the signing of a license agreement and an engineering
> services agreement with ITT Corporation.  Our second quarter
> revenues represent the start of activities with ITT, which occurred
> during the last six weeks or so of the second quarter.

98.    During the call, Parker stated:

> While I won't get into the specifics of ITT's applications, I feel
> very comfortable reporting that as we progress down the path of
> assisting ITT and applying d2p to their specific needs that *the
> technology continues to demonstrate the strong benefits that we've
> been discussing since the inception of d2p*.  (Emphasis added).

99.    Defendants' representations concerning ParkerVision's relationship with ITT

were materially false and misleading for the reasons described in paragraphs 34-67.

100.    During the August 8, 2007 conference call, Parker also claimed that ParkerVision

was making significant advancements with multiple OEMs that were purportedly interested in

incorporating the Company's d2p technology into their consumer handsets.

101.    In particular, Parker stated:

> We have OEMs that have moved into very specific implementation
> discussions with us that tie[] up some of their precious resources
> and that we don't believe [are] just an exercise.…
>
> [W]e have initiated a program directed at network carriers about a
> year ago.  We believe that this was an important segment of the
> marketplace to educate about d2p technology and the benefits…
> And some of our carrier relationships have now evolved to result
> in carriers who are willing to proactively encourage OEMs to

move forward with our technology and who have even said they will participate in network tests with d2p and have even shared a willingness to shoulder some of the product development costs for an OEM to incorporate d2p into their products.…

*Since we're confident that commercial handset adoption is when, not if,* we continue to advance the tools and processes that will assist OEMs in moving as quickly as possible through the design engineering all the way into volume production.  We've created a great deal of Silicon-verified intellectual property.  At this point, we've been able to develop and evolve our own design tools and processes that will help speed OEMs to market.  We've also started to work with a Tier One RF chip manufacturing test equipment company that will help OEMs move to volume production more quickly.

What these ParkerVision tools, processes, silicon-verified IP, and manufacturing test readiness all mean is that d2p is being readied and in my opinion will rival the way legacy technologies are designed and ready for production by being more streamlined in time-to-market and providing the support that enables OEMs to move to successful implementation with a very high level of confidence.  So, *ParkerVision hasn't just created the technology and the silicon that verifies that it performs as built, but it's creating many tools and processes to enable design, development, and volume manufacturing support to ensure success for OEMs that adopt d2p technology*.  (Emphasis added).

102.     Parker's statements were materially false and misleading for the reasons set forth in paragraphs 34-67.

103.     In addition, Parker vastly overstated the extent of network carriers' relationships with ParkerVision.  Contrary to his statements, the network carriers were not encouraging OEMs to incorporate ParkerVision's d2p technology into their handsets.  Nor had the network carriers expressed any willingness to share product development costs necessary to incorporate d2p technology into OEMs' products.

### E.  The Third Quarter 2007 Earnings Call

104.    ParkerVision announced its results for the third quarter of 2007 on November 5, 2007.

105.    During the conference call held to discuss those results, Defendants made several materially misleading representations concerning the ITT contract, ParkerVision's d2p technology and the Company's operations.

106.    With respect to the ITT contract, Parker misleadingly stated:

> [O]ur first steps with ITT were to define the product implementation and architectural approach of our technology for certain applications within their marketplace…While I am not at liberty to describe their product plans, *I am able to tell you that the fundamentals of our technology as a flexible platform and its ability to process many different RF waveforms and to do so efficiently in both power usage and hardware implementation continues to be the value proposition of our technology.* (Emphasis added).

107.    Parker later added, "Let me close by saying, we are gratified and extremely encouraged by the pace and progress of our initial contract win for d2p, our relationship with ITT."

108.    Parker's statements concerning the ITT relationship were materially false and misleading for the reasons set forth in paragraphs 34-67.

109.    With respect to ParkerVision's d2p technology and its promise for developing profitable commercial sales, Parker also misleadingly stated:

> So now let's move into an update on our progress and the goal of finalizing initial design wins in the wireless handset markets.  This is a tricky topic to discuss with you not because we are not making great progress because we are, but because there are genuine constraints of what is and is not appropriate for ParkerVision to discuss publicly before the fact.

So here is what I think is appropriate to share with you today.  We have made very good progress on several fronts towards engaging in our initial agreement.  I would say that we are in a similar territory when early in this year I told you that I thought there would be a good possibility that we would have an unscheduled conference call update before our next planned financial update.  That comment preceded our announcement of our ITT relationship.  At this time we are certainly keeping our legal counselors busy.  Obviously I want you to understand that I can't guarantee this.  If we controlled all the factors on both sides of the negotiation towards a final agreement then we could, but we only get to handle one pen, there are other pens that we don't control but *we are engaged with parties that are cooperative, enthusiastic, and wanting to get the closure so the products can be fielded sooner than later with our technology*.  (Emphasis added).

110.    Parker also claimed that "ParkerVision's investment to build the portfolio of IP and supporting hardware that we have has been a good one and an investment that we believe will continue to grow significantly more valuable as adoption of our offering converges with these important industry trends."

111.    These representations were materially false and misleading for the reasons specified in paragraphs 64-67.

**F.    The November 11, 2007 AeA Financial Conference Presentation**

112.    Parker continued his pattern of making false representations concerning purported customers for the Company's d2p technology during a November 11, 2007 presentation that he made at the AeA Financial Conference.  During that presentation, Parker stated:

While lots of people are talking about next generation ideas, ParkerVision has it.  It's been working silicon now.  We have our first customer.
…
We have been evolving the silicon; we have a lot of demonstrable devices.
…
Last but not least, *we've gotten far enough down the road now with certain commercial customers that we're in negotiation with and in our latest conference call, we were confident enough to say that*

26

*we believe they'll hear we have our first commercial customer that*
*we'll be able to announce before the next scheduled conference*
*call.*  So, these are all the reasons, in combination of what we
believe, we're really on the right track to make a very successful
company out of this.  (Emphasis added).

113.    Those statements were materially false and misleading for the reasons stated in

paragraphs 34-67.

114.    A principal of the MaxTak Plaintiffs was present at this AeA Financial

Conference and had direct discussions with Parker in which Parker represented that ParkerVision

would secure a deal with an OEM to utilize d2p technology prior to the Company's next

scheduled investor call.

### G.  Defendants' December 3, 2007 Response To A Negative Barron's Article

115.    On December 3, 2007, Barron's published a negative article about ParkerVision

and its dubious technology claims titled "The Strange Case of ParkerVision."

116.    Immediately following the publication of the Barron's article, ParkerVision

moved to quell investor concern.

117.    To serve that objective, ParkerVision held an investor conference call on

December 3, 2007.  During that call, Parker stated:

[Y]ou can take the chips we've developed and anybody who's
experienced in the industry can see a clear roadmap.  This is why I
told people, it's not something that when we sign a deal, they'll be
putting into a product next week.  I've projected 12 months, 18
months from the time we get signing, depending upon how
comprehensive [a] number of standards they wanted to operate in.
But that's the process of taking what we've got today, converting it
to their high volume usage… *I can tell you, there is not one of*
*them that I'm aware of that doesn't believe that this technology*
*won't work exactly the way that we've stated it will work.*

118.    ParkerVision issued a press release on December 3, 2007 in which Parker made

additional false claims designed to counteract Dr. Farmwald's criticisms of the d2p technology.

119.    Parker stated that, contrary to Dr. Farmwald's analysis, handsets that utilized ParkerVision's d2p technology would not require a DSP device to offset the RF signal distortion caused by the d2p's processing of the RF signal.  Thus, Parker claimed, the power efficiencies achieved by the d2p device would not be offset by the power consumed by a DSP because "[t]he fact is, one of the benefits of the company's d2p technology, is that it does not require the use of DSPs."

120.    The representations set forth in paragraphs 117-19 were materially false and misleading for the reasons set forth in paragraphs 34-67.  Moreover, Dr. Farmwald has pointed out that ParkerVision's provisional patent applications (pending at the time of Parker's denials) refute Parker's claims and demonstrate that ParkerVision's d2p technology "clearly . . . needs DSP functionality."

121.    During the December 3, 2007 investor call, defendant Robert G. Sterne, a ParkerVision director and outside patent attorney, also made false, reassuring representations to ParkerVision investors.  In particular, Sterne stated that, contrary to the *Barron's* article and Dr. Farmwald's analysis, the d2p technology performed in precisely the manner that Defendants described.  Sterne stated:

> . . . I am a founding partner of Sterne, Kessler, Goldstein & Fox PLLC, one of the largest specialty patent law firms based in Washington, D.C., which boasts an international clientele of high-tech innovators…I have had a life-long personal interest in radio technology.  My interest in radio took me to engineering school at Tufts University in Boston, where I earned my B.S.E.E. and M.S.
>
> . . . [A]fter I was provided with this opportunity to represent ParkerVision, I was immediately impressed by the breakthroughs that ParkerVision had achieved, and I was shown the demonstration by Jeff Parker and David Sorrells, their RF visionary.  At that time I decided, because I was frankly intellectually blown away by their fundamental breakthroughs, to take the assignment to represent ParkerVision in creating an

outstanding patent portfolio for their fundamental breakthroughs. *I assembled a top-flight team of patent attorneys for my firm with the requisite technical background, and we created and obtained an outstanding patent portfolio for their fundamental breakthroughs.*

We have endeavored from the very beginning of the project to achieve the highest quality of legal protections that we can obtain from the various patent offices around the world. *I can tell you as a person who is extensively involved in RF technology that the ParkerVision breakthroughs are fundamental and extremely real. And have been tested and verified and quantified at all levels. So, any questions that have been raised by this article concerning the technological effectiveness and efficiency of these breakthroughs are in my professional opinion completely incorrect*, and I cannot understand why these statements have been made by individuals who do not have access to the technology that I have. (Emphasis added).

122. In the December 3, 2007 press release, Sterne also asserted that "ParkerVision technology is documented, proven and tested. I know RF firsthand and the ParkerVision breakthroughs are fundamental and have the potential to change the wireless world dramatically in the next decade."

123. Those representations were materially false and misleading for the reasons set forth in paragraphs 34-63. Sterne's false and misleading statements, made as a director of the Company, were particularly egregious because he asserted that, as a patent attorney of substantial experience and expertise, he had confirmed that d2p was a "fundamental" breakthrough. By invoking his purported technical expertise and extensive patent experience in his glowing endorsements of d2p's effectiveness and efficiency, Sterne convinced investors that any dissenting voices concerning the significance and viability of the technology were incorrect.

124.    A principal of the MaxTak Plaintiffs had direct discussions with Parker concerning the *Barron's* article.  During those detailed discussions, Parker stated that all of the negative information in the article was entirely false and merely the fabrication of short sellers.

125.    Following the publication of the *Barron's* article, Parker promised to assuage any lingering investor concern by publishing a detailed technical explanation of how ParkerVision's d2p technology worked.  In a December 3, 2007 Form 8-K filed by ParkerVision, the Company claimed that Parker had sent a November 29, 2007 written response to questions posed by Bill Alpert, author of the *Barron's* article, prior to the article's publication.  In the November 29 letter, Parker stated "With the issuance of these [d2p] patents, we now feel that our intellectual property is adequately protected and we are in a position to begin to provide technical presentations at technical industry conferences and we expect to do so over the upcoming year. This effort will be supplemented with an update to our website in the near future that will incorporate additional technical data on our technologies and their implementations."

126.    Several months later, in March 2008, ParkerVision added some efficiency claims for d2p technology to its website, without providing any supporting technical explanations.  In fact, to this day, the Company's website has posted only vague claims regarding d2p's benefits, uncorroborated test results that purport to demonstrate d2p's high efficiency and performance, and a single article by ParkerVision's Director of Technical Marketing that vaguely trumpets the capabilities of the d2p technology.  Furthermore, the Company appears to have made only a single technical presentation regarding d2p at an industry conference, the 38th Annual European Microwave Conference, in late October 2008.

127.    Parker also flatly denied a statement in the *Barron's* article that ITT had pulled its engineers off of the project that the Company had announced in May 2007.  Specifically, Parker stated:

> Well, it's progressing exactly as per the contract… I'm not going to violate any confidence, other than to say our relationship with ITT is very good… *The ITT agreement is going along as planned, the relationship is good, and . . . we believe they will be able to get their products out as we communicated to the investment community before as scheduled.*  (Emphasis added).

128.    That representation was materially false and misleading for the reasons alleged in paragraphs 34-67.  Despite the breakdown of the ITT-ParkerVision relationship, ParkerVision continued to proclaim that it expected its arrangements with ITT to produce $25 million in revenue for ParkerVision.

**H.  The December 21, 2007 Cellular OEM Announcement**

129.    Defendants continued their campaign to offset the negative effects of the *Barron's* article in a December 21, 2007 press release that announced that ParkerVision had signed an OEM licensing agreement with an unnamed "worldwide provider of chipsets to mobile handset manufacturers."

130.    In that press release, ParkerVision stated that it anticipated that the royalties related to the OEM agreement would range from approximately $5 million to $10 million, with significant future growth potential.  The press release also stated that the unnamed customer was targeting its initial product launch for late 2008.

131.    During the conference call that ParkerVision held to discuss this development, Parker stated:

> An exclusive request of our customer is that their identity not be disclosed.  This is for sound strategic reasons, and I am speaking from their point of view.  Although I would love to share with you

31

who this customer is, if you look at many companies in this
competitive space, it is not uncommon to hold their suppliers in
confidence for strategic reasons.

132.    Defendants' statements concerning the supposed new customer were materially

false and misleading for the reasons set forth in paragraph 34-70.

133.    During the same conference call, Parker made the following statement concerning

ParkerVision's ITT project:

ITT continues to move along. They, you know, we're in frequent
kind of ongoing dialogue with them, which is just the very nature
of our working relationship. They've continued to sell it. *They're
very pleased with the relationship, like the direction that it's taken,
and continue to be enthusiastic about this technology and how it
fits into their future products.* (Emphasis added).

134.    Those representations were materially false and misleading for the reasons

specified in paragraphs 34-67.

135.    During the call, Parker also repeated his promise to release a more detailed

technical explanation of how ParkerVision's d2p technology worked, stating that the Company

was busy readying updates to its website that "will start to discuss in more detail 'what exactly is

the science behind this technology, and why does it deliver the benefits that it can deliver.'"

136.    As already discussed, in March 2008, ParkerVision did finally add some

efficiency claims for d2p technology to its website, but without providing any useful technical

data.

137.    These announcements had the intended effect of boosting the Company's stock

price from $13.18 to $15.75, or 19.5%, in one day. In fact, however, the supposed OEM

licensing agreement did not resemble the arrangement that Defendants described, promised no

chance of leading to the successful commercialization of d2p technology, and had no potential

for producing any meaningful revenues for ParkerVision.

32

### I.   The 20th Annual OC Growth Stock Conference Presentation

138.    On February 19, 2008, ParkerVision made a presentation at the 20th Annual OC Growth Stock Conference presented by Roth Capital Partners.  During the presentation, Defendants made materially misleading representations concerning ParkerVision's d2p technology, its prospects for successful commercialization and the Company's future revenue. Parker stated:

> So what we end up with [d2p] is exceptional power efficiency, very good waveform fidelity, universal waveform support from a single circuit, much smaller bill of material costs and size, and we don't require the kind of correction circuitry that people have always tried to attach[] to these types of advanced architectures.
> …
> If you look at that as kind of a midpoint between what we would like [in terms of royalties] and what [the OEMs] would hope that we would take, you would see that the value proposition translates to a total available market, in terms of licensing revenue for the company in 2010 for 3‑ and 4G handsets, of between about a 150 million on the low end and about 600 million on the high end.

139.    Those representations were materially false and misleading for the reasons set forth in paragraphs 34-70.

### J.   The Fourth Quarter and Year End 2007 Results

140.    In connection with the announcement of ParkerVision's fourth quarter and year end 2007 financial results, Defendants made several materially false and misleading representations concerning the Company's d2p technology.

141.    In its Annual Report for 2007, filed on or about March 14, 2008, the Company stated:

> Based on the established royalty rates and other contract terms, as well as our understanding of ITT's product plans, we currently estimate that *we will achieve cumulative royalties under our agreement with ITT of approximately $25 million*.

*We also anticipate that royalties from our mobile handset chip customer will range from approximately $5 million to $10 million in the first full year of shipments* depending upon the customer's product mix and unit volume as well as the timing of incorporation of the d2d receiver technology into products.  We also believe the opportunity exists to significantly expand our royalty revenue from this customer based on the expected growth of the market in which their products are targeted, additional product applications for our technology which are contemplated in the agreement and our customer's ability to capture greater share of market for their products.  We believe the initial ICs incorporating our technology will be completed in late 2008.  (Emphasis added).

142.    Shortly after issuing the Annual Report, ParkerVision announced its 2007 fourth quarter and year end results on March 17, 2008.

143.    During the conference call held to discuss fourth quarter and year end results, Defendants made additional materially misleading representations concerning the ITT contract, ParkerVision's d2p technology and the Company's operations.

144.    With respect to the ITT contract, Poehlman reported that ParkerVision had generated a total of $284,000 in revenue from engineering design services provided to ITT. Poehlman also misleadingly stated:

These [engineering design] services included architectural design analysis and recommendations based on various product specifications put forth by ITT.  Over the last few months, ITT has utilized that information to evaluate and determine their internal product development plan.  While notably this process has taken a bit longer than we anticipated, we are extremely pleased and excited about our opportunities with ITT.

Based on recent discussions, we anticipate that ITT will utilize our existing commercial prototype design and their own internal resources to design their initial products incorporating our technology... As we stated previously, *we continue to expect cumulative revenues from ITT of approximately $25 million over the term of this contract.*  (Emphasis added).

145.    Parker noted that the engineering design revenue from ITT was from the second and third quarters of 2007, and that no revenue had been recognized for the fourth quarter. Parker averred that this was no cause for concern, stating, "We are absolutely still on track with ITT and they remain enthusiastic about the use of technology in their products."

146.    Poehlman's and Parker's statements concerning the ITT relationship were materially false and misleading for the reasons set forth in paragraphs 34-70.

147.    With respect to ParkerVision's d2p technology and its prospects for developing profitable commercial sales, Parker also misleadingly stated:

> Some of the claims about our technology have raised eyebrows from those who think about our technology from a traditional point of view. *I can tell you with a 100% certainty that everything we have claimed about our benefits is coming out right on target. In fact, if anything, there are a few performance areas that are even better than my best expectations could have hoped for.*
> …
> Progress with our first mobile handset application is moving along exactly as we had hoped for…We have a target to deliver volume producible silicon to our first customer in early Q4 [2008] that they can productize in volumes for their first applications which are in 3G handsets. Royalties from this relationship begins when they begin shipping chipsets that incorporate our technology to their customers which are ODMs and OEMs which product handsets. Their goal is to ramp their first products as quickly as possible once we deliver volume ready silicon. *I believe both companies are highly motivated to move the technology into volume production as quickly as possible and we expect this to result in our first commercial royalty revenue shortly thereafter.*
> …
> *I am very confident that we will secure more commercial accounts in 2008, that when we aggregate the handset market share of these accounts we'll account for a meaningful share of the total handset market space.* (Emphasis added).

148.    Those representations were materially false and misleading for the reasons set forth in paragraphs 34-67.

149.     During the call, Parker also repeated his promise to release detailed technical data

on d2p, stating:

> In just a matter of days from now, we will begin the process of
> updating our website by putting specific information that
> showcases the performance of our technology.  We will show you
> how a single d2p RF chip processes all the relevant 2G to 4G
> standards providing both high-fidelity RF waveforms, while under
> those same exact operating conditions, uses significantly less
> power for the complex cell phone waveforms.
>
> We will also describe the supporting circuitry, so that you can
> understand the benefits of our technology in a complete d2p
> handset.  We will be setting up the information in a way that you
> will be able to understand our efficiency benefits against
> traditional devices….

150.     Defendants failed, however, to provide detailed technical data on d2p, posting

only vague claims regarding d2p's purported benefits with little supporting detail.  Nor has

ParkerVision subjected its technology to the type of peer review that scientists typically utilize to

validate new technology.

**K.  The First Quarter 2008 Results**

151.     ParkerVision announced its first quarter results for 2008 on May 7, 2008.

152.     In the press release announcing these results, Parker stated, "We believe the

progress with both existing and prospective customers continues to prove that the core benefits

of our technology—multi mode functionality, integration capability and unsurpassed

efficiencies—are in lock step with the needs and trends in the industry and we are as confident as

ever that our RF technologies will achieve widespread adoption in the mobile handset industry."

153.     Parker's statements were materially false and misleading for the reasons set forth

in paragraphs 34-67.

36

154.     During the call to discuss the first quarter results, Defendants made additional materially misleading representations concerning the ITT contract, ParkerVision's d2p technology, and the Company's supposed current and potential customers.

155.     With respect to the ITT contract, Parker stated:

> [ITT] have shared with us that they are impressed with the performance and the efficiency of the technology…We are extraordinarily pleased with our progress at ITT… [W]e are bullish on both shorter term as well as the long‑term prospects for our business relationship with them.

156.     Parker's statements concerning the ITT relationship were materially false and misleading for the reasons set forth in paragraphs 34-67.

157.     With respect to ParkerVision's d2p technology, its supposed current and prospective customers, and expected future earnings and market share, Parker misleadingly stated:

> [T]he performance figures of merit of our transmitted signal exceeded both our own and our [first commercial] customer's high expectations…[W]e were all very pleased that the figures of merit achieved exceed even both our expectations and our customer's high expectations….
> …
> Well, one of the reasons I went into this detail today regarding the currents customers is that we are certain that the progress and success we are having with these first customers, in terms of meeting and exceeding timelines and expectations, is a big influence on driving additional business…We're in the middle of a very promising dialogue with a number of companies in the local handset space.
>
> *I am very confident that some of these will convert into our next design wins and business agreements*.  How confident are we?  As I said in the past, we believe these next wins are a "when" not an "if" proposition.  We continue to largely focus our efforts on companies who are shipping in volume... typically measured in the millions, in fact, tens of millions of shipments per month.
> …

> Given the strength of our technology, the needs of our targeted market, *I believe it is reasonable to expect ParkerVision to target and achieve shared market penetration that will incorporate our technology into a third or greater of the 3G and emerging 4G handset market, and to achieve that goal in the next few years*, two or three with continued growth, which will put us well on our way to achieving our vision of becoming a de facto standard in that important space.
>
> By the way, that marketing option translates to around 15% of the overall total handset market.  Given a reasonable range of royalty expectation and assuming that ParkerVision has 30 million shares of stock outstanding, *I believe this will translate into an annual result of $2 to $3 dollars a share in pre -taxed earnings for the company.*  (Emphasis added).

158.    Those representations were materially false and misleading for the reasons set forth in paragraphs 34-70.

**L.  The Second Quarter 2008 Earnings Call**

159.    ParkerVision announced its second quarter results for 2008 on August 11, 2008.

160.    During the call to discuss the second quarter results, Defendants made several materially misleading representations concerning the ITT contract, ParkerVision's d2p technology, and the likelihood that d2p will be successfully commercialized.

161.    With respect to the ITT contract, Parker stated:

> Our engineering team as well as our sales organization, continues to be actively engaged with ITT.  ITT continues to invest resources in D2P…We remain confident that ITT and ParkerVision can incorporate the benefits of D2P into government and military wireless communications.

162.    Parker's statements concerning the ITT relationship were materially false and misleading for the reasons set forth in paragraphs 34-67.

163.    With respect to ParkerVision's d2p technology and its prospects for successful commercialization, Parker misleadingly stated:

38

[W]e are on track with what we shared in our last update to you for delivery of volume-producible d2p chips in the fourth quarter to our first mobile phone chip set customer.  These chips will not only verify that our technology is superior for handset solutions, but provides the multiple benefits that we've spoken about.

…

With regard to our first commercial customer who is incorporating D2P into 3G mobile handset chipsets, our confidence continues to grow as we're moving ever closer to volume chips, and the potential for what our company[] will soon be bringing to the handset market.

…

Just as I was confident in our investment in D2P then, it is my personal goal and belief that we will secure our next OEM agreement before the next scheduled conference call.

…

In our last update we expressed our belief that we could gain adoption that would put us at a market share run rate by the end of next year that's in the high single digits, perhaps low double digits as measured against the 3G handset market.  That market next year is forecast to be in the 500 million unit range and growing the following two years by another 50%, to around 750 million units annually.  Based on our continued progress, I continue to stand by that belief.

By the way, it's our belief that our existing commercial customer can account for a mid to high single digit high market share run rate for us by the end of next year with growth potential beyond that.

For a little longer term given the strength of our technology, I remain confident that ParkerVision can achieve share market penetration.  They will incorporate our technology into a third or greater of the 3G, and emerging 4G handset market.

164.    These representations were materially false and misleading for the reasons set forth in paragraphs 34-67.

**L. The Third Quarter 2008 Results**

165.    ParkerVision announced its third quarter 2008 results on November 10, 2008.

166.    In the press release announcing these results, Parker stated, "We remain on track to deliver production-ready IC designs to our commercial chipset customer this quarter.  We

expect to continue to work closely with them as they implement our designs in high volume

chipsets, the shipment of which will begin our royalty revenues from this customer.  Based on

the status of negotiations with prospective customers, we remain confident in our ability to

secure an additional contract in the mobile handset space in the very near term."

167.    Parker's statements were materially false and misleading for the reasons set forth

in paragraphs 34-67.

168.    During the conference call held to discuss the third quarter 2008 results,

Defendants made additional materially misleading representations concerning the ITT contract,

ParkerVision's d2p technology and the Company's operations.

169.    With respect to ParkerVision's d2p technology and its prospects for developing

profitable commercial sales, Parker misleadingly stated:

> In this challenging environment, we believe our technology is very
> well positioned to help us meet the challenge of achieving
> commercial success.  So while I am disappointed that we didn't
> achieve our goal of securing our next customer before this call, I
> haven't lost sight of the fact that we have made very good progress
> with more than one customer, even in these challenging times.
> Based on the advanced state of some of our discussions and
> negotiations, *I do believe that you will be hearing of its success in
> the very near future, days not months from now*.
> …
> On the topic of delivering production‑ready silicon chips for our
> first commercial customer, we remain right on track to deliver in
> this current quarter…Remember, although we are designing these
> first d2p chipsets, our relationship is one where we are the licensor
> and receive a royalty and it is our customers who make[] their own
> chipsets under that license.  We expect they will be in a position in
> this quarter to start their own d2p test and qualification and we
> would expect to be working closely with them to assist in their
> implementation of our designs into volume production chipsets in
> the first quarter of '09.
>
> One additional comment that I want to make regarding delivery of
> our chips is to point out that this reaffirms that there are no
> unforeseen issues that we have encountered, which shouldn't be

> taken for granted, as the development of silicon chips for RF
> applications, especially ones that are based upon a completely new
> technology is a very big milestone.  (Emphasis added).

170.    Those representations were materially false and misleading for the reasons set

forth in paragraphs 34-67.

171.    With respect to the ITT contract, Parker stated:

> In addition to the initial d2p application that they have identified
> and that we have previously discussed, they have been very active
> in pursuing additional business opportunities that incorporate d2p
> into products for their customers.  We are excited about the
> potential of the wins that they are working on that includes d2p.
> We believe that ITT will prove to be an important long‑term
> customer and we have seen many opportunities that can be won in
> partnership with them… at this time, I really can't tell you anymore
> other than the opportunities they are working on, from my view,
> are very significant.  And I believe they will get some of the ones
> they are going after, I don't say get all of them, but they will be
> good contributors to ParkerVision's revenue stream.

172.    Parker's statements concerning the ITT relationship were materially false and

misleading for the reasons set forth in paragraphs 34-67.

## V.    DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS AND OMISSIONS AND UNLAWFUL COURSE OF CONDUCT WERE THE PROXIMATE CAUSE OF PLAINTIFFS' DAMAGES

173.    ParkerVision securities were traded in a developed and efficient market.  The

information disclosed by Defendants to the public concerning ParkerVision was incorporated

into the trading prices of the Company's securities by the market for those securities in a manner

that caused the prices to reflect all publicly available information concerning ParkerVision.

174.    The market prices of ParkerVision securities did not reflect the information that

Defendants successfully concealed from the market.  By concealing that information, Defendants

therefore caused the Company's securities to trade at inflated prices throughout the Relevant

Time Period.  As a result, Plaintiffs paid artificially inflated prices for all of the ParkerVision securities that they purchased.

175.    The following factors, among others, directly contributed to the efficiency of the market for ParkerVision securities:

a)    Throughout the period in which Plaintiffs were purchasing and selling ParkerVision securities, the Company's stock traded on the NASDAQ Global Market, an open and efficient market;

b)     During that period, ParkerVision common stock traded an average of 192,910 shares per day, a volume that confirms the efficiency of the market for the Company's securities;

c)    As of February 28, 2007, there were 24,386,507 shares of ParkerVision common stock outstanding, and, by October 31, 2008, the Company had 26,677,906 outstanding shares;

d)    Throughout the period in which Plaintiffs were purchasing and selling ParkerVision securities, Defendants regularly distributed news concerning the Company's financial results, operations and business prospects to investors through: press releases that the Company issued over wire services and through the ParkerVision website; the securities filings that ParkerVision regularly made with the SEC (including quarterly Form 10-Qs and annual Form 10-Ks); the conference calls that ParkerVision held at least quarterly to discuss the Company's financial results, operations and business prospects; the ParkerVision website; and interviews that defendant Parker and other ParkerVision executives conducted with various media outlets;

e)      ParkerVision securities were widely held by institutional investors, including the MaxTak Plaintiffs; and

f)      As of December 2011, there were still 32 firms making a market in ParkerVision common stock and thereby facilitating the liquidity of the market for those securities.

176.    As a result of these factors, the price of ParkerVision securities responded quickly to the disclosure of material news concerning the Company's operations and prospects in those instances where Defendants made full, truthful disclosures.  Throughout the period in which Plaintiffs were trading ParkerVision securities, the market prices of those securities reflected the market's assessment concerning the value of the securities based upon the disclosures that Defendants made and the information that the market uncovered independently.

177.    As Plaintiffs allege above, however, Defendants consistently concealed from Plaintiffs and other investors a variety of material facts concerning the Company, including its true financial results, the true value of the Company's technology, the actual perception of manufacturers concerning the Company's technology, and ParkerVision's potential to generate profitable sales of its products.  As a result, the market price of ParkerVision securities remained inflated throughout the Relevant Time Period.

178.    Even by the time Plaintiffs completed their sales of their ParkerVision holdings, some inflation in prices of the Company's securities prices persisted as a result of Defendants' pattern of deceptive conduct and consistent efforts to rebut any adverse information concerning the Company.  Throughout the Relevant Time Period, Defendants' unequivocal denials of adverse statements made by others concerning ParkerVision and the Company's technology contributed materially to the ongoing inflation in the price of ParkerVision securities.

43

179.     Eventually, however, an increasing number of market participants began to question the credibility of ParkerVision management and the accuracy of Defendants' representations concerning the Company's technology, financial performance and prospects.  As that skepticism grew, the market price of ParkerVision securities began to decline at a rate far in excess of the change in the market prices of similar technology stocks.

180.     As the decline in the market prices of ParkerVision securities occurred – in the face of Defendants' continuing positive statements concerning the Company's operations and prospects – Plaintiffs suffered massive losses in their holdings of ParkerVision securities.

181.     Plaintiffs suffered substantial losses as a direct and proximate result of Defendants' deceptive conduct.

182.     None of the Plaintiffs would have invested in ParkerVision securities at the prices that they paid had they known the truth concerning the material facts that Defendants misrepresented and failed to disclose.

183.     Indeed, had Plaintiffs known the true facts concerning Parker's credibility, the nature of the technology owned by ParkerVision and the Company's ability to generate successful sales, they never would have purchased ParkerVision stock or sold ParkerVision puts securities at all.

184.     Moreover, had Defendants made timely and accurate disclosures concerning the material matters that they misrepresented and concealed from investors, Plaintiffs would have sold their holdings of ParkerVision securities at a more accelerated pace than they did, thereby limiting the losses that they suffered as a direct and proximate result of Defendants' deceptive conduct.

## VI.   ADDITIONAL FACTS THAT RAISE A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER

185.     The facts that Plaintiffs allege above demonstrate that Defendants made their false statements and material omissions with knowledge of, or with grossly reckless disregard for, their falsity.

186.     In particular, the conclusion that Defendants acted with scienter is inescapable in light of the fact that their fraud hinged upon their false statements and omissions regarding the basic capabilities of their single product – the d2p transmitter-power amplifier – and Defendants' efforts to commercialize that product.  Because their entire business plan depended upon demonstrating the value of d2p in commercial products, Defendants could not have remained unaware of the deficiencies of the d2p technology that Plaintiffs outline above or their ongoing inability to consummate a revenue-producing transaction with any OEM.

187.     Furthermore, Defendants knew of – and indeed responded to – the PV Notes website and the detailed criticisms that Drs. Farmwald and Paldus and others published concerning the deficiencies of the d2p technology and the misleading quality of Defendants' representations concerning that technology.  Those critiques of the d2p technology would have apprised Defendants of the falsity of their representations, even had they somehow remained oblivious to the deficiencies of ParkerVision's primary product before the publication of the PV Notes assessments.

188.     Defendants' interactions with the OEMs and other companies to which Defendants attempted to sell the d2p technology also necessarily informed Defendants of the falsity of their representations.

189.     As Dr. Farmwald outlined in PV Notes, Defendants attempted to convince many major users of RF power amplification devices to adopt ParkerVision's d2p technology.

Universally, however, those manufacturers informed Defendants that they would not use d2p technology in their devices.  Moreover, several of those highly knowledgeable companies disclosed to Defendants that the d2p technology was not commercially viable for the reasons that Plaintiffs specify above.

190.    The powerful motives that Defendants possessed for misleading investors regarding the Company's d2p technology further support the conclusion that Defendants acted with scienter.

191.    Following ParkerVision's filing of its 2005 patent related to d2p technology, the Company conducted a series of private placement stock offerings.  In each case, ParkerVision completed those offerings shortly before it was required to file its annual Form 10-K report with the SEC.

192.    By means of those offerings, ParkerVision raised more than $80 million that the Company required to fund its ongoing operations.

193.    The following chart summarizes the timing and amount of ParkerVision's securities offerings:

| Date | 10-K Date | Money Raised | Securities Issued |
| --- | --- | --- | --- |
| 3/14/2005 | 3/16/2005 | $21.6 million | 2,880,000 shares of stock 720,000 warrants |
| 2/3/2006 | 3/8/2007 | $17.8 million | 2,373,335 shares of stock 593,335 warrants |
| 2/23/2007 | 3/8/2007 | $8.4 million | 992,441 shares of stock |
| 3/6/2008 | 3/17/2008 | $9.3 million | 1,240,199 shares of stock |
| 3/3/2009 | 3/16/2009 | $9.4 million | 3,484,309 shares of stock |
| 11/16/2009 | 3/15/2010 | $14.6 million | 8,000,000 shares of stock |

194.    In its annual 10-Ks, ParkerVision was required by law to include audited financial statements, including an audit report issued by an independent auditing firm that opined that those financial statements fairly presented ParkerVision's results in accordance with generally accepted accounting principles ("GAAP").

195.    Had ParkerVision failed to demonstrate that it had sufficient cash on hand to operate for at least twelve months following the completion of any given audit, the auditors would have been required to issue a "going concern" audit opinion that highlighted the existence of serious questions regarding ParkerVision's continued viability.

196.    In those circumstances, ParkerVision also would have been required to disclose in the notes to its financial statements the doubts that existed regarding its ability to operate and any plans that the Company's management had developed for returning to viability.

197.    Thus, successfully completing the securities offerings allowed ParkerVision to avoid the need to disclose that its viability was threatened, a disclosure that is commonly recognized in the business community as a self-fulfilling prophecy.

198.    In connection with each of the foregoing securities offerings, Defendants highlighted the supposed advantages and capabilities of the d2p technology.  Obviously, had Defendants disclosed that their primary product was not commercially viable because it suffered from the deficiencies that Plaintiffs particularize above, Defendants could not have completed those securities offerings.

199.    Furthermore, ParkerVision has never been a profitable company.  In fact, during the Relevant Time Period, ParkerVision produced net losses of $18.2 million in 2007, $23.1 million in 2008 and $21.5 million in 2009.  At the end of the following years, ParkerVision held the specified amounts of cash and cash equivalents on its balance sheet: 2004 – $6.4 million;

2005 – $10.3 million; 2006 – $13.2 million; 2007 – $13.4 million; 2008 – $4.8 million; and 2009 – $13.5 million.

200.    Thus, ParkerVision plainly needed to raise cash by means of its securities offerings to finance its ongoing business activities.  In fact, ParkerVision could not have continued in operation without completing those securities offerings.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Against All Defendants for Common Law Fraud)

201.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. Plaintiffs assert this cause of action against all Defendants.

202.    As Plaintiffs allege in detail above, Defendants made and participated in the making of misrepresentations of material fact concerning: ParkerVision's financial results; the effectiveness of the Company's d2p technology; and ParkerVision's success in securing customers for that technology.

203.    Defendants also failed to disclose or fraudulently concealed material facts concerning the same subject matters that, under the circumstances, Defendants were obligated to disclose.

204.    Before they purchased ParkerVision stock and sold ParkerVision puts, Plaintiffs read or heard all of the misrepresentations that they allege above that pre-dated their purchases.

205.    At the time that they made their purchases and sales of ParkerVision securities, Plaintiffs relied directly upon Defendants' material misrepresentations and omissions.  Plaintiffs reasonably believed that Defendants had made truthful statements concerning the matters that

Defendants misrepresented and had no reasonable means for uncovering the false nature of Defendants' statements or that they had concealed material adverse facts from Plaintiffs.

206.    Plaintiffs' reliance was reasonable because, among other reasons: (a) Defendants owed investors in ParkerVision securities fiduciary obligations of good faith, fair dealing and loyalty at the time that Defendants made their false statements and material omissions; (b) Defendants' misrepresentations and omissions concerned matters exclusively within their knowledge, including the capabilities of ParkerVision's d2p technology and the Company's communications with OEMs and other potential customers for that technology; (c) Plaintiffs and other ParkerVision investors lacked access to the adverse information that they have subsequently learned regarding ParkerVision and its d2p technology; and (d) Defendants capitalized upon the highly technical nature of the deficiencies of d2p technology to conceal those adverse facts from ParkerVision investors.

207.    Thus, Plaintiffs actually, reasonably, foreseeably and justifiably relied upon Defendants' misrepresentations and omissions in purchasing ParkerVision stock and selling the Company's put options.

208.    As Plaintiffs allege in detail above, Defendants made their material misrepresentations and omissions knowingly or with conscious indifference to the truth and with fraudulent intent.

209.    As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs suffered significant losses in connection with their investments in ParkerVision securities.

210.    Plaintiffs would never have purchased ParkerVision stock or sold ParkerVision put options had they known the truth concerning the Company's operations, financial results,

technology or prospects for generating profitable sales of that technology to manufacturers. Thus, Plaintiffs would not have suffered the losses that they endured in connection with their investments in ParkerVision securities in the absence of Defendants' misrepresentations and omissions.

211.    Furthermore, the value of the ParkerVision securities that Plaintiffs held declined dramatically in 2008 and 2009 as investors gradually came to question the credibility of Defendants' consistently positive representations concerning ParkerVision's operations.  Thus, Plaintiffs' losses resulted directly and proximately from the market's gradual appreciation that Defendants had misrepresented and omitted material facts.

212.    Plaintiffs are therefore entitled to an award of damages and punitive damages against Defendants in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Aiding and Abetting Common Law Fraud)

213.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. Plaintiffs assert this cause of action against all Defendants.

214.    As set forth above, Defendants intentionally and knowingly defrauded Plaintiffs by misrepresenting and concealing material facts concerning, among other things, ParkerVision's financial results, the effectiveness of the Company's d2p technology and its success in securing customers for that technology.  Those misrepresentations and omissions were designed to and did induce Plaintiffs to purchase ParkerVision securities at inflated prices.

215.    Each Defendant knew of the misrepresentations and omissions described above.

216.    Moreover, Defendants knowingly, recklessly, and intentionally rendered substantial assistance to their co-Defendants' efforts to defraud Plaintiffs.

217.    In particular, each Defendant acted in conjunction with the other Defendants to issue the material misrepresentations that Plaintiffs allege and to conceal the adverse material facts that Defendants failed to disclose to Plaintiffs and other investors.

218.    As a direct and proximate result of Defendants' fraudulent conduct and the substantial assistance that they rendered to their fellow Defendants, Plaintiffs were injured when they purchased ParkerVision securities at inflated prices and when those securities declined in value as market participants gradually came to question the credibility of Defendants' false statements.

219.    Plaintiffs are therefore entitled to an award of damages and punitive damages against Defendants in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Against All Defendants for Negligent Misrepresentation)

220.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein, except those allegations that state that any of the Defendants acted in a fraudulent manner.  Plaintiffs assert this cause of action against all Defendants.

221.    This cause of action does not sound in fraud.

222.    In making the material misrepresentations and omissions that Plaintiffs allege above, Defendants acted without any reasonable grounds for believing that the representations they made were true.

223.    Defendants owed Plaintiffs a duty of due care because: (a) Defendants made the positive representations concerning ParkerVision that Plaintiffs allege above; and (b) by virtue of their positions as ParkerVision's Chairman and CEO and a ParkerVision director, Parker and

Sterne owed duties of good faith, fair dealing and due care to Plaintiffs and other investors in ParkerVision securities.

224.    Had Defendants employed due care, they would have discovered and known of their misstatements and material omissions.

225.    Before they purchased ParkerVision stock and sold ParkerVision put options, Plaintiffs read or heard all of Defendants' misrepresentations that pre-dated Plaintiffs' purchases.

226.    At the time that they made their purchases of ParkerVision stock and sales of ParkerVision put options, Plaintiffs relied directly upon Defendants' material misrepresentations and omissions.  Plaintiffs reasonably believed that Defendants had made truthful statements concerning the matters that Defendants misrepresented and had no reasonable means for uncovering the false nature of Defendants' statements or that they had concealed material adverse facts from Plaintiffs.

227.    Thus, Plaintiffs actually, reasonably, foreseeably and justifiably relied upon Defendants' misrepresentations and omissions in purchasing ParkerVision stock and selling ParkerVision put options.

228.    As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiffs purchased ParkerVision stock and sold ParkerVision put options at inflated prices and sustained substantial damages.

229.    Plaintiffs are therefore entitled to an award of damages against Defendants in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Rescissory damages in an amount to be determined at trial;

C.    Punitive damages in an amount to be determined at trial;

D.    Interest at the legal rate;

E.    The reasonable costs, expenses and attorneys' fees incurred by Plaintiffs

in connection with this action; and

F.    Such other and further relief as the Court deems just and proper.

### *JURY TRIAL DEMANDED*

Plaintiffs hereby demand a trial by jury.

Dated:  December 28, 2011                    **STONE BONNER & ROCCO LLP**

By:   /s/ James P. Bonner
      James P. Bonner (jbonner@lawssb.com)
      Patrick L. Rocco (procco@lawssb.com)
447 Springfield Avenue, Second Floor
Summit, New Jersey 07901
(908) 516-2045

**FLEISCHMAN LAW FIRM PLLC**
Keith M. Fleischman
(keith@fleischmanlawfirm.com)
June H. Park (jpark@fleischmanlawfirm.com)
565 Fifth Avenue, Seventh Floor
New York, New York 10017
(212) 880-9571

*Counsel for Plaintiffs*

# **Exhibit A**

|  | PRICE | BOUGHT | Total Shares Bought |
|---|---|---|---|

**MaxTak Plaintiffs 2007 Purchases**

4XTX

| DATE | PRICE | # Bought | Total Shares Bought |
|---|---|---|---|
| 03/26/07 | 13.32 | 10,645 | |
| 04/26/07 | 12.47 | 840 | |
| 08/08/07 | 11.21 | 7,082 | 18,567 |
| 08/09/07 | 11.37 | 6,090 | 24,657 |
| 08/10/07 | 11.38 | 3,500 | 28,157 |
| 08/13/07 | 12.93 | 2,040 | 30,197 |
| 08/14/07 | 13.29 | 1,750 | 31,947 |
| 08/15/07 | 13.44 | 15,059 | 47,006 |
| 08/16/07 | 12.98 | 12,787 | 59,793 |
| 08/17/07 | 12.5 | 4,000 | 63,793 |
| 08/20/07 | 12.19 | 920 | 64,713 |
| 08/21/07 | 11.9 | 600 | 65,313 |
| 08/23/07 | 12.41 | 7,320 | 72,633 |
| 08/24/07 | 12.1 | 1,280 | 73,913 |
| 08/27/07 | 12.34 | 4,000 | 77,913 |
| 08/31/07 | 11.63 | 7,779 | 85,692 |
| 09/04/07 | 12.2 | 8,266 | 93,958 |
| 09/05/07 | 13.01 | 14,000 | 107,958 |
| 09/06/07 | 13.09 | 800 | 108,758 |
| 09/07/07 | 15.17 | 600 | 109,358 |
| 09/10/07 | 15.55 | 200 | 109,558 |
| 09/11/07 | 14.42 | 4,134 | 113,692 |
| 09/12/07 | 14.79 | 2,500 | 116,192 |
| 09/20/07 | 13.87 | 2,550 | 118,742 |
| 09/21/07 | 14.04 | 5,600 | 124,342 |
| 09/26/07 | 14.91 | 2,500 | 126,842 |
| 10/01/07 | 15.37 | 2,500 | 129,342 |
| 10/04/07 | 15.3 | 11,388 | 140,730 |
| 10/05/07 | 14.43 | 4,407 | 145,137 |
| 10/09/07 | 14.98 | 20,421 | 165,558 |
| 10/11/07 | 15.02 | 2,950 | 168,508 |
| 10/12/07 | 15.11 | 47,124 | 215,632 |
| 10/15/07 | 15.49 | 11,347 | 226,979 |
| 10/17/07 | 15.29 | 9,650 | 236,629 |
| 10/22/07 | 15.13 | 5,288 | 241,917 |
| 10/26/07 | 14.91 | 5,800 | 247,717 |
| 10/31/07 | 15.13 | 3,650 | 251,367 |
| 11/01/07 | 15.38 | 6,200 | 257,567 |
| 11/08/07 | 13.78 | 30,150 | 287,717 |
| 11/09/07 | 13.13 | 4,907 | 292,624 |
| 11/13/07 | 12.71 | 80,650 | 373,274 |
| 11/14/07 | 11.7 | 69,600 | 442,874 |

| | | | |
|---|---|---|---|
| 11/15/07 | 10.51 | 44,173 | 487,047 |
| 11/16/07 | 10.5 | 294 | 487,341 |
| 11/19/07 | 10.124 | 30,000 | 517,341 |
| 11/20/07 | 10.37 | 13,650 | 530,991 |
| 11/21/07 | 10.14 | 49,112 | 580,103 |
| 11/23/07 | 9.56 | 13,633 | 593,736 |
| 11/26/07 | 9.98 | 13,136 | 606,872 |
| 11/27/07 | 9.82 | 9,972 | 616,844 |
| 11/28/07 | 9.93 | 7,483 | 624,327 |
| 11/29/07 | 9.41 | 29,093 | 653,420 |
| 11/30/07 | 9.3 | 30,459 | 683,879 |
| 12/04/07 | TFR | 917,478 | 1,601,357 |
| 12/06/07 | 8.4 | 649 | 1,602,006 |
| 12/07/07 | 8.98 | 2,656 | 1,604,662 |
| 12/10/07 | 9.2 | 44,275 | 1,648,937 |
| 12/11/07 | 9.72 | 204,450 | 1,853,387 |
| 12/12/07 | 9.91 | 4,100 | 1,857,487 |
| 12/13/07 | 10.59 | 26,014 | 1,883,501 |
| 12/14/07 | 10.76 | 28,100 | 1,911,601 |
| 12/17/07 | 11.11 | 38,250 | 1,949,851 |
| 12/18/07 | 11.3 | 213,146 | 2,162,997 |
| 12/19/07 | 12.57 | 20,448 | 2,183,445 |
| 12/20/07 | 12.04 | 16,600 | 2,200,045 |
| 12/21/07 | 11.92 | 17,569 | 2,217,614 |
| 12/24/07 | 12.45 | 10,164 | 2,227,778 |
| 12/26/07 | 12.5 | 4,900 | 2,232,678 |
| 12/27/07 | 15.2 | 2,500 | 2,235,178 |
| 12/28/07 | 14.31 | 19,246 | 2,254,424 |
| 12/31/07 | 14.61 | 5,000 | 2,259,424 |

PRICE       BOUGHT

**MaxTak Plaintiffs 1/08 - 10/08 Purchase Data**

4XTX

| DATE | PRICE | Bought | Total Shares Bought |
|---|---|---|---|
| 01/02/08 | 14.6500 | 44,739 | 44,739 |
| 01/03/08 | 14.8600 | 13,429 | 58,168 |
| 01/04/08 | 15.2000 | 50,771 | 108,939 |
| 01/07/08 | 15.2200 | 14,108 | 123,047 |
| 01/08/08 | 15.1700 | 6,800 | 129,847 |
| 01/09/09 | 14.3600 | 5,550 | 135,397 |
| 01/10/08 | 13.3500 | 12,000 | 147,397 |
| 01/11/08 | 13.3600 | 11,450 | 158,847 |
| 01/14/08 | 13.4400 | 11,186 | 170,033 |
| 01/15/08 | 13.7300 | 16,451 | 186,484 |
| 01/16/08 | 14.3000 | 100 | 186,584 |
| 01/16/08 | TFR | 150,000 | 336,584 |
| 01/22/08 | 11.7000 | 50 | 336,634 |
| 01/24/08 | 10.5421 | 20,000 | 356,634 |
| 01/24/08 | 10.5300 | 420,500 | 777,134 |
| 01/28/08 | 10.1600 | 1,350 | 778,484 |
| 01/30/08 | 9.5500 | 2,111 | 780,595 |
| 01/30/08 | 10.3100 | 22,530 | 803,125 |
| 02/11/08 | 11.0500 | 50 | 803,175 |
| 02/21/08 | 10.2100 | 59,100 | 862,275 |
| 02/22/08 | 11.0100 | 41 | 862,316 |
| 02/27/08 | 9.6928 | 8,000 | 870,316 |
| 02/28/08 | 9.6329 | 6,500 | 876,816 |
| 02/29/08 | 9.9700 | 5,200 | 882,016 |
| 03/03/08 | 9.9043 | 19,200 | 901,216 |
| 03/04/08 | 9.7277 | 6,400 | 907,616 |
| 03/05/08 | 8.8185 | 14,787 | 922,403 |
| 03/06/08 | 8.0337 | 36,900 | 959,303 |
| 03/11/08 | 8.2909 | 8,100 | 967,403 |
| 03/12/08 | 8.3195 | 43,568 | 1,010,971 |
| 03/13/08 | 8.1262 | 20,588 | 1,031,559 |
| 03/14/08 | 8.0885 | 19,792 | 1,051,351 |
| 03/17/08 | 7.8330 | 3,300 | 1,054,651 |
| 03/18/08 | 7.6901 | 31,730 | 1,086,381 |
| 03/18/08 | 7.7100 | 9,396 | 1,095,777 |
| 03/18/08 | TFR | 733,489 | 1,829,266 |
| 03/19/08 | 8.0375 | 13,600 | 1,842,866 |
| 03/19/08 | 7.7000 | 29,200 | 1,872,066 |
| 03/20/08 | 7.4278 | 49,203 | 1,921,269 |
| 03/20/18 | 7.2800 | 24,200 | 1,945,469 |
| 03/24/08 | 7.7349 | 108,741 | 2,054,210 |
| 03/24/08 | 7.6300 | 55,609 | 2,109,819 |

| | | | |
|---|---|---|---|
| 03/25/08 | 7.3498 | 63,096 | 2,172,915 |
| 03/26/08 | 7.2209 | 20,000 | 2,192,915 |
| 03/26/08 | 7.3951 | 84,421 | 2,277,336 |
| 03/26/08 | 7.3200 | 67,400 | 2,344,736 |
| 03/27/08 | 7.4676 | 33,535 | 2,378,271 |
| 03/27/08 | 7.4400 | 492 | 2,378,763 |
| 03/28/08 | 7.4039 | 42,207 | 2,420,970 |
| 03/28/08 | 7.3600 | 2,000 | 2,422,970 |
| 03/31/08 | 7.3110 | 45,299 | 2,468,269 |
| 04/01/08 | 7.9089 | 81,100 | 2,549,369 |
| 04/01/08 | 7.7300 | 180,651 | 2,730,020 |
| 04/02/08 | 7.8831 | 100,708 | 2,830,728 |
| 04/02/08 | 7.7300 | 14,000 | 2,844,728 |
| 04/03/08 | 7.2120 | 105,866 | 2,950,594 |
| 04/03/08 | 7.8200 | 3,900 | 2,954,494 |
| 04/04/08 | 7.7797 | 26,700 | 2,981,194 |
| 04/07/08 | 7.7142 | 16,398 | 2,997,592 |
| 04/08/08 | 7.5939 | 14,100 | 3,011,692 |
| 04/08/08 | 7.6200 | 5,200 | 3,016,892 |
| 04/09/08 | 7.8763 | 30,140 | 3,047,032 |
| 04/09/08 | 7.8600 | 2,100 | 3,049,132 |
| 04/10/08 | 8.0745 | 29,400 | 3,078,532 |
| 04/11/08 | 8.3704 | 18,200 | 3,096,732 |
| 04/14/08 | 8.2271 | 12,600 | 3,109,332 |
| 04/14/08 | 8.1400 | 800 | 3,110,132 |
| 04/15/08 | 8.2539 | 2,914 | 3,113,046 |
| 04/15/08 | 8.1900 | 500 | 3,113,546 |
| 04/16/08 | 8.1604 | 3,796 | 3,117,342 |
| 04/16/08 | 8.0200 | 1,000 | 3,118,342 |
| 04/17/08 | 7.8322 | 7,700 | 3,126,042 |
| 04/17/08 | 7.8000 | 800 | 3,126,842 |
| 04/18/08 | 7.9133 | 1,800 | 3,128,642 |
| 04/21/08 | 8.0440 | 500 | 3,129,142 |
| 04/21/08 | 8.2300 | 200 | 3,129,342 |
| 04/22/08 | 8.3454 | 7,800 | 3,137,142 |
| 04/22/08 | 8.3700 | 2,700 | 3,139,842 |
| 04/23/08 | 8.4681 | 1,600 | 3,141,442 |
| 04/23/08 | 8.3900 | 1,100 | 3,142,542 |
| 04/25/08 | 8.3910 | 10,708 | 3,153,250 |
| 04/28/08 | 8.7100 | 600 | 3,153,850 |
| 04/28/08 | 8.5000 | 6,500 | 3,160,350 |
| 04/29/08 | 8.8149 | 3,900 | 3,164,250 |
| 04/29/08 | 8.7500 | 1,706 | 3,165,956 |
| 04/30/08 | 8.5000 | 400 | 3,166,356 |
| 04/30/08 | 8.7300 | 5,600 | 3,171,956 |
| 05/01/08 | 8.9900 | 2,771 | 3,174,727 |
| 05/02/08 | 8.9900 | 500 | 3,175,227 |

| | | | |
|---|---|---|---|
| 05/05/08 | 8.9800 | 1,700 | 3,176,927 |
| 05/06/08 | 9.2885 | 11,500 | 3,188,427 |
| 05/06/08 | 9.3100 | 8,200 | 3,196,627 |
| 05/07/08 | 9.1174 | 3,900 | 3,200,527 |
| 05/08/08 | 9.2263 | 1,900 | 3,202,427 |
| 05/08/08 | 9.2200 | 1,000 | 3,203,427 |
| 05/09/08 | 9.1800 | 6,400 | 3,209,827 |
| 05/12/08 | 9.0136 | 19,714 | 3,229,541 |
| 05/12/08 | 8.9400 | 2,000 | 3,231,541 |
| 05/13/08 | 9.6710 | 2,000 | 3,233,541 |
| 05/13/08 | 9.6400 | 5,000 | 3,238,541 |
| 05/20/08 | 10.1700 | 1,150 | 3,239,691 |
| 05/21/08 | 10.1400 | 450 | 3,240,141 |
| 05/22/08 | 10.2300 | 2,000 | 3,242,141 |
| 05/23/08 | 10.2250 | 200 | 3,242,341 |
| 05/27/08 | 10.2525 | 600 | 3,242,941 |
| 05/28/08 | 10.3793 | 750 | 3,243,691 |
| 05/29/08 | 10.3628 | 10,502 | 3,254,193 |
| 05/30/08 | 10.4890 | 2,000 | 3,256,193 |
| 06/02/08 | 10.3800 | 1,058 | 3,257,251 |
| 06/04/08 | 11.2223 | 13,100 | 3,270,351 |
| 06/04/08 | 11.2500 | 50 | 3,270,401 |
| 06/06/08 | 11.5300 | 500 | 3,270,901 |
| 06/09/08 | 11.5050 | 200 | 3,271,101 |
| 06/10/08 | 11.7150 | 200 | 3,271,301 |
| 06/11/08 | 11.8881 | 3,600 | 3,274,901 |
| 06/11/08 | 11.9990 | 4,000 | 3,278,901 |
| 06/11/08 | 12.0700 | 2,200 | 3,281,101 |
| 06/16/08 | 12.1900 | 100 | 3,281,201 |
| 06/17/08 | 11.9989 | 7,000 | 3,288,201 |
| 06/18/08 | 11.8968 | 5,550 | 3,293,751 |
| 06/19/08 | 11.7394 | 3,400 | 3,297,151 |
| 06/20/08 | 11.6000 | 7,500 | 3,304,651 |
| 06/23/08 | 11.3900 | 3,000 | 3,307,651 |
| 06/24/08 | 11.0800 | 7,250 | 3,314,901 |
| 06/25/08 | 11.0000 | 80,300 | 3,395,201 |
| 06/26/08 | 10.7100 | 2,000 | 3,397,201 |
| 06/27/08 | 10.4000 | 7,400 | 3,404,601 |
| 06/30/08 | 10.5900 | 3,731 | 3,408,332 |
| 07/01/08 | 10.2400 | 7,025 | 3,415,357 |
| 07/02/08 | 9.9400 | 11,567 | 3,426,924 |
| 07/03/08 | 9.9700 | 4,400 | 3,431,324 |
| 07/07/08 | 9.5200 | 500 | 3,431,824 |
| 07/08/08 | 9.0700 | 17,000 | 3,448,824 |
| 07/09/08 | 8.4600 | 1,842 | 3,450,666 |
| 07/15/08 | 9.0400 | 15,071 | 3,465,737 |
| 07/16/08 | 9.1600 | 8,900 | 3,474,637 |

| | | | |
|---|---|---|---|
| 07/18/08 | 9.4300 | 1,400 | 3,476,037 |
| 07/21/08 | 10.2200 | 100 | 3,476,137 |
| 07/21/08 | 10.2600 | 1,704 | 3,477,841 |
| 07/22/08 | 11.1650 | 2,000 | 3,479,841 |
| 07/22/08 | 10.9395 | 4,645 | 3,484,486 |
| 07/22/08 | 10.1300 | 100 | 3,484,586 |
| 07/23/08 | 10.9945 | 5,800 | 3,490,386 |
| 07/24/08 | 10.7700 | 1,000 | 3,491,386 |
| 07/25/08 | 11.0000 | 500 | 3,491,886 |
| 07/28/08 | 11.3037 | 13,931 | 3,505,817 |
| 07/29/08 | 11.2409 | 11,300 | 3,517,117 |
| 07/30/08 | 11.4383 | 6,000 | 3,523,117 |
| 08/04/08 | 11.0900 | 2,400 | 3,525,517 |
| 08/04/08 | 11.0867 | 6,904 | 3,532,421 |
| 08/05/08 | 10.9195 | 19,000 | 3,551,421 |
| 08/06/08 | 10.7135 | 10,072 | 3,561,493 |
| 08/07/08 | 10.4400 | 6,200 | 3,567,693 |
| 08/08/08 | 10.4482 | 1,419 | 3,569,112 |
| 08/12/08 | 10.9800 | 1,000 | 3,570,112 |
| 08/13/08 | 11.3100 | 300 | 3,570,412 |
| 08/13/08 | 11.2438 | 2,100 | 3,572,512 |
| 08/14/08 | 10.9691 | 1,100 | 3,573,612 |
| 08/15/08 | 10.0361 | 20,389 | 3,594,001 |
| 08/15/08 | 10.2390 | 34,459 | 3,628,460 |
| 08/18/08 | 10.1052 | 15,535 | 3,643,995 |
| 08/19/08 | 10.2803 | 3,300 | 3,647,295 |
| 08/20/08 | 10.1300 | 47,100 | 3,694,395 |
| 08/20/08 | 10.2170 | 1,000 | 3,695,395 |
| 08/20/08 | 10.0397 | 15,000 | 3,710,395 |
| 08/21/08 | 9.6441 | 12,077 | 3,722,472 |
| 08/22/08 | 9.3846 | 17,416 | 3,739,888 |
| 08/25/08 | 9.3497 | 23,579 | 3,763,467 |
| 08/26/08 | 9.7971 | 8,299 | 3,771,766 |
| 08/27/08 | 10.7248 | 3,100 | 3,774,866 |
| 08/28/08 | 10.5874 | 4,300 | 3,779,166 |
| 08/29/08 | 10.9839 | 2,000 | 3,781,166 |
| 09/02/08 | 10.6981 | 2,100 | 3,783,266 |
| 09/02/08 | 10.7761 | 12,975 | 3,796,241 |
| 09/03/08 | 10.9444 | 5,363 | 3,801,604 |
| 09/04/08 | 10.7301 | 26,018 | 3,827,622 |
| 09/05/08 | 10.6833 | 5,404 | 3,833,026 |
| 09/08/08 | 10.7286 | 228 | 3,833,254 |
| 09/09/08 | 10.9711 | 12,578 | 3,845,832 |
| 09/10/08 | 11.1100 | 400 | 3,846,232 |
| 09/10/08 | 11.2369 | 23,700 | 3,869,932 |
| 09/11/08 | 11.1900 | 7,540 | 3,877,472 |
| 09/11/08 | 10.9724 | 30,634 | 3,908,106 |

| | | | |
|---|---|---|---|
| 09/11/08 | 11.3392 | 19,614 | 3,927,720 |
| 09/12/08 | 11.0600 | 23,300 | 3,951,020 |
| 09/12/08 | 11.0831 | 9,411 | 3,960,431 |
| 09/12/08 | 11.0346 | 34,303 | 3,994,734 |
| 09/15/08 | 11.3400 | 4,000 | 3,998,734 |
| 09/15/08 | 11.6143 | 3,000 | 4,001,734 |
| 09/15/08 | 11.3281 | 59,000 | 4,060,734 |
| 09/16/08 | 11.0100 | 3,600 | 4,064,334 |
| 09/16/08 | 11.4310 | 40,700 | 4,105,034 |
| 09/17/08 | 11.5241 | 40,635 | 4,145,669 |
| 09/18/08 | 11.1400 | 800 | 4,146,469 |
| 09/18/08 | 11.0291 | 56,095 | 4,202,564 |
| 09/19/08 | 11.4200 | 1,800 | 4,204,364 |
| 09/19/08 | 11.1580 | 56,262 | 4,260,626 |
| 09/22/08 | 11.4698 | 64,060 | 4,324,686 |
| 09/23/08 | 12.7503 | 48,493 | 4,373,179 |
| 09/24/08 | 13.1251 | 28,014 | 4,401,193 |
| 09/25/08 | 12.6856 | 22,200 | 4,423,393 |
| 09/26/08 | 12.0657 | 19,014 | 4,442,407 |
| 09/29/08 | 11.8039 | 30,730 | 4,473,137 |
| 09/30/08 | 11.5672 | 16,460 | 4,489,597 |
| 10/01/08 | 11.3769 | 24,799 | 4,514,396 |
| 10/02/08 | 10.0587 | 4,600 | 4,518,996 |
| 10/06/08 | 10.0052 | 16,400 | 4,535,396 |
| 10/07/08 | 8.8304 | 2,800 | 4,538,196 |
| 10/08/08 | 8.6927 | 8,600 | 4,546,796 |
| 10/09/08 | 6.4800 | 45,400 | 4,592,196 |
| 10/09/08 | 6.7460 | 135,000 | 4,727,196 |
| 10/30/08 | 3.9300 | 276,902 | 5,004,098 |

**MaxTak Plaintiff Purchases 11/08-10/29/09**

| TradeDate | Quantity | Price | PrincipalAmount |
|---|---|---|---|
| 11/13/2008 | 6,500 | 10 | -65,000.00 |
| 11/19/2008 | 2,300 | 10 | -23,000.00 |
| 11/20/2008 | 4,400 | 12.5 | -55,000.00 |
| 11/21/2008 | 55,600 | 10 | -556,000.00 |
| 11/21/2008 | 10,700 | 7.5 | -80,250.00 |
| 11/24/2008 | 10,100 | 12.5 | -126,250.00 |
| 12/12/2008 | 5,600 | 12.5 | -70,000.00 |
| 12/15/2008 | 400 | 12.5 | -5,000.00 |
| 12/17/2008 | 2,500 | 12.5 | -31,250.00 |
| 12/22/2008 | 5,700 | 10 | -57,000.00 |
| 12/29/2008 | 4,100 | 7.5 | -30,750.00 |
| 12/31/2008 | 2,500 | 7.5 | -18,750.00 |
| 12/31/2008 | 9,600 | 10 | -96,000.00 |
| 1/5/2009 | 8,300 | 10 | -83,000.00 |
| 1/5/2009 | 10,200 | 12.5 | -127,500.00 |
| 1/9/2009 | 700 | 10 | -7,000.00 |
| 1/16/2009 | 52,700 | 10 | -527,000.00 |
| 1/16/2009 | 23,400 | 7.5 | -175,500.00 |
| 1/16/2009 | 39,600 | 12.5 | -495,000.00 |
| 2/20/2009 | 19,700 | 10 | -197,000.00 |
| 3/26/2009 | 7,000 | 1.65 | -11,550.00 |
| 3/26/2009 | 100 | 1.65 | -165 |
| 3/26/2009 | 100 | 1.66 | -166 |
| 10/29/2009 | 2,600 | 10 | -26,000.00 |
| | 284,400 | | -2,864,131.00 |